Thank you, Judge Watford, and may it please the Court. My name is Neil Katyal, and I'm joined today by Nicholas Varey. I'd like to reserve three minutes for rebuttal, and I'll concentrate my argument today on the excessiveness of punitive damages. But to the extent the panel has any questions on causation or the other elements, Mr. Varey is here to address them. In this case, the jury imposed compensatory damages of $1.8 million against Crane, one of several manufacturers of asbestos-containing gaskets that were sold to the Navy. And on top of that $1.8 million, the jury then imposed an additional $5 million against Crane and Punitivs. Now, we believe that decision on Punitivs was wrong for two reasons. First, the course of conduct that Coulbourn complains about took place across the nation. Crane sold these products to the Navy all 50 years ago. This conduct has been the subject of repeated litigation and massive, massive compensatory damage verdicts and many more to come. In this unusual circumstance, due process carefully circumscribes punitive damage awards for the reasons Judge Friendly outlined earlier. It's hard to determine what other juries will do, and there are a high amount of compensatory damages from these other cases. And at that point, the deterrence and blameworthiness rationales are weak. Then the second argument is that just that argument, no punitives whatsoever, or just for a smaller ratio? No, I think as our brief says at page 50, our opening brief, I don't think this court needs to go so far as to say no punitives whatsoever. I think that it would be pushed toward the one-to-one ratio that would ordinarily apply when you have large compensatory verdicts under the State Farm decision. I think my friend is absolutely right that the Supreme Court has said time and again, there's no magic formula. It's not always one-to-one by any stretch. But at page 425 of the State Farm decision, the court said when there's high amounts of compensatory damages, when they're substantial, then it should be one-to-one. And Exxon versus Baker is a very good example of this, in which the Supreme Court took down a four-to-one or five-to-one award and pushed it down to one-to-one. And for reasons like this, due process reasons is footnote 28 in their opinion set. And so that's really, I think, what we're asking for here. The idea that when you have already a large compensatory verdict of $1.8 million, but then when you think about the entire tapestry of litigation against Crane for this specific conduct, and then you were asked to perform the State Farm analysis, which is, does the additional amount of punitive damages make sense, given the large amount of compensatories that's faced? I think the answer to that question is no in this circumstance. OK, and then the second argument? And the second argument is the standard three-guidepost analysis, so that even if you didn't want to look to the other verdicts and other settlements against Crane, which are obviously substantial, just for this case alone, we think that if you just perform straightforward State Farm analysis, don't look at anything else, we think each of the three guideposts has failed. We don't think the conduct here was sufficiently reprehensible to justify an additional amount of punitive damage award of this magnitude. We think that the ratio of 2.7 to 7 to 1 was too much under these circumstances. And we think, my friend, I think he essentially concedes the third guidepost, which is the comparable verdicts that have been upheld. He points to nothing in Arizona, not just on asbestos, but on product liabilities more generally, in which you've had such a large amount of punitive damages awarded. And so maybe to just back up and take you a little bit more into the first argument about others, Judge Friendly, I think, pointed this out 50 years ago. This is a very big danger of punitive damage awards, that when you have big amounts of litigation and single juries, seriatim deciding these things with tunnel vision, it poses dangers. One danger it poses is to other plaintiffs. Because if you allow verdicts to occur, particularly large punitive damage verdicts to occur, then other plaintiffs may be out of luck one day because the funds are depleted, companies go out of business, and the like. This case is a perfect illustration of this. Aubrey cited the 10-Q that Crane filed last year. Just last month, they filed an updated 10-K explaining how much asbestos litigation they face. They have settled $535 million in claims. They paid out $535 million. 130,000 lawsuits have been made against them, and 2,500 more come each year. Asbestos is fairly unique because it has a long latency period, a long time before it sets in. And so Crane expects to have, they said in their 10-K, additional litigation for years to come. And the concern that Judge Friendly was raising and Roginsky is if you allow, again, any one of these cases to proceed and the jury to proceed in a fairly unfettered way, you really do put other plaintiffs, future plaintiffs, out of luck. And is it the case that in virtually all of those suits, I didn't realize it was in the above 100,000, punitive damages are requested? I wouldn't want to say, the 10-K doesn't specify, but based on the ones I've seen, punitive damages are requested. I mean, I think it would be, I wouldn't say it'd be malpractice, but I think it would be a pretty unusual circumstance for a plaintiff to file a suit just for compensatory damages, absolutely. So I take it from your answer to Judge Watford earlier that you aren't saying there can't be any punitive damages. So are you saying that we should impose a one-to-one ratio ourselves? I think that you should. And I think you should for the reasons that the Supreme Court outlined in State Farm. And punitive damages is a really unusual thing. But State Farm says it can be any one single-digit ratio. We've got a single-digit ratio. So it's a little hard to see how we're not within what State Farm allows. Well, let me just read to you the language from State Farm at page 425. Quote, ratios greater than these we have previously upheld may comport with due process, where a particularly egregious act has resulted in a small amount of economic damages. The converse is also true, however, when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. And at page 438, Justice Ginsburg, in her dissent, called this a one-to-one benchmark. That's a quote from her, a one-to-one benchmark. And I do think that's the way other courts have applied it. I think Exxon v. Baker is another Supreme Court example like that. And in tier, yes, I think that when you have already a large amount of compensatory damages and you are performing the State Farm analysis, which is unusual, it's an analysis that is de novo review. It's not like other parts in which district courts get massive deference. So Judge Rakoff, if you were fortunate enough to be sitting as a district court judge in this Paris of the West here in the city and your colleagues were reviewing you, ordinarily, it would be a circumstance in which you'd have massive deference, of course. But punitive damages is different. And there's some I'm moving tomorrow. The Supreme Court has said there's a risk of capriciousness. And that was what requires really scrutiny, Judge Friedland, over the ratio. Let me ask you a different question. What struck me in this case was Arizona's very, very high standard for punitive damages, higher, for example, than a benighted state like New York. And so in order to show punitive damages here, you have to show under Arizona law, quote, defendant's evil hand was guided by an evil mind. That's Rawlings versus Apoduca, an Arizona case from their Supreme Court. The, quote, the evil mind which will justify the imposition of punitive damages must be manifested in the described ways. So given that extremely high standard, and given that you're not arguing that they did not meet that standard, at least that's what you seem to be saying to Judge Watford, then why doesn't a higher ratio kick in? So I'm glad you brought that up to Dracoff. We do think that, and our brief goes into some detail, that we don't think that they have met, at least for purposes of large amounts of reprehensibility, that Arizona standard. They have not acted with an evil mind. They haven't alleged intentional conduct or something like that. What they've- The jury wasn't told where they, if you want to just award a little bit of punitive damages, the standard is here. But if you want higher punitive damages, the standard is there. They were told it's the high standard for any punitive damages. Right. And we agree that, as this case comes to the court, I don't think that we are saying to you that you should reopen the factual finding that the jury made. Rather, what we are saying is you have to still ask the further question, how reprehensible is that conduct under State Farm? And- You do make that argument. And I guess most of my questions, actually, are on that point for your opponent. You make the straight up sufficiency challenge that the evidence didn't meet the high bar in Arizona. I think we do. I wouldn't put too much emphasis on that for reasons that I do think that, at the end of the day, I think that this court has to defer under the Ninth Circuit's Planned Parenthood decision to factual determinations. I think the stronger version of the argument, the one that we're really resting on today, is when you're asking how reprehensible is that conduct, the fact that it's not intentional, the fact that it's not acting with an evil mind, and most significantly- But the jury seems to have thought it was acting with an evil mind. Both ways on that point. Well, again, we're not saying that- I don't think they ever found evil mind. I think what they found was substantial indifference to the value of human life. I think that's what the closing is about. So it's not intentional in the way that Judge Rakoff was pointing out. I think that State Farm says, you've got to ask, how reprehensible is that conduct? And in addition to the factors we've just been talking about, the Arizona statute 12-689, which says- Well, I think the jury instruction said that they had to find that Crane Company acted with an evil mind. They said they could find it. Your point is they could find it in one of two ways. Exactly. But they still had to find it. Exactly. And they couldn't find it just through gross negligence or anything. Correct. In effect, wanton disregard at an absolute minimum. Correct. And there's one other important point about Arizona law. Arizona's enacted a statute, 12-689, which says, look, you can get compensatory damages when you sell gut products to the government. But when it comes to punitive damages, it's a really different thing. There's a very strong shield in Arizona that says there's an important public policy interest in making sure our contractors don't get sued. And again, as you think about how reprehensible was that conduct, and can it justify this massive punitive damages award, I think the Arizona statute really bears on that. Whether or not you think it squarely applies, my friend has some arguments to the contrary. The district judge said the Arizona statute doesn't apply because there was no Navy rule that barred warnings from coming in. That's not in the statute. There's nothing like that in the statute. And indeed, just recently, last month, the district court in Arizona decided on the basis of this statute, 12-689, and rejected a very similar argument in a case that it's called Creighton versus Poultry Farms just last month. And what that case is about is you had a circumstance in which the chickens were approved for sale by the USDA. And the plaintiff said, hey, you know, the USDA didn't approve the specific injury. They didn't have, quote, comprehensive testing for bacteria. And what the district court in Arizona said is, that's not what the statute says. The statute's a much broader shield against punitive damages liability. And we don't allow plaintiffs to kind of slice and dice and pick and say, you know, you didn't preclude one thing or didn't preclude another. Rather, the general question is, was this product approved for sale? And our brief takes you through pages 40 to 45, a lot of evidence saying these products were approved for sale. OK. Thank you. Let's hear from counsel for the plaintiffs. Good morning. May it please the court. I'm Brian Barrow. I represent Sandra Colburn and her family. We view this case as a very straightforward case under the applicable standards of review. In the issue raised this morning, there's no reason on this record to usurp either the jury's or the trial court's or the district court's decisions in finding that the award was not excessive and was, in fact, So let's focus on just the straight sufficiency challenge. Because that's really where most of my questions go. I don't think you presented enough evidence to meet the Arizona test. It is a very demanding one. So help me understand what you think are the most powerful pieces of evidence you introduced on that. Well, the most powerful piece of evidence, Your Honor, is the admission by Crane that they knew that asbestos was dangerous in the 30s. Crane management knew. Yeah, but right. Asbestos in general, but not. I mean, they certainly never conceded that they knew, even as late as the 60s, that the quantities of asbestos fibers that would be released in the normal handling of their product was dangerous to human health, right? And the only reason that they may not have known that, and we don't agree that they didn't know that, if they didn't know that, they should have known that. They didn't test. They didn't test. And that's at most gross negligence. So that's why I guess, what did you have? Because as I understand it, even the most watered down version of the Arizona standard is that you've got to show they acted with a conscious and deliberate disregard for the interests of others, right? So they had to be subjectively aware that, hey, we've got a product here that if we don't warn people and they just handle it in the normal course, it will eventually kill them. But we're not going to say anything, because we want to put our profits above human health, right? So what did you have that showed that they were subjectively aware of the dangers posed by their products, not asbestos generally, but their product? Because they knew that their products, when used in the ordinary and expected way, would be scraped, wire brushed, power wire brushed, would create dust. So I would love it if you could give a record site for this, because I see the testimony that the plaintiff had all this dust and wire brushing, et cetera. But I had a little trouble finding anything that showed that Crane knew that all this dust and wire brushing was going to happen. All of this was set forth in the brief. It's the testimony of Mr. Panaglioni, who is the Director of Environmental Services, or he had a title. Page 16 of my brief begins with a section on, and so Mr. Panaglioni testifies. Page 16 of the brief goes through, and his testimony is at, he conceded at one, volume one of the supplemental excerpts of record, page 59. He conceded that there were some individuals within the company that had different levels of knowledge. He goes on to acknowledge that these individuals had knowledge about asbestos earlier in 1970, were officers of Crane. All of this goes through. Point me to somewhere where the record shows that Crane knew that people using these gaskets were going to end up with dust, because they're going to have to grind them. Well, I can't, off the top of my head, without this in front of me, I can't give a specific citation. But that is what was argued to the court. That is what was argued to the jury. And that is what the district court found. The district court found that there was substantial evidence to support that finding by the jury. But you can't show us where that was told to the jury. I'm sure I could, but off the top of my head, I'd have to take a moment here to, I mean, there's dust. I mean, Panaglioni talks about how Dr. Harvey of Crane knew about articles called dust. No, I understand that there were articles saying dust is dangerous. What I want to know is, did Crane know that these gaskets would have to be destroyed and turned into dust in the regular course of using them? Of course. How do we know that from the record? Well, we know that circumstantially because we know that Crane is a manufacturer of valves. Valves require these gaskets to be placed on. And for these valves to operate properly, the gaskets were inserted between flanges of pipes and the valve itself. And in order for those gaskets to be replaced and repaired, that's when the valve was taken off of the pipes, they would have, these gaskets had to be, these gaskets, because of the heat and various things that occurred in the, with the valve, had to, would become adhered or baked to the flange. Right, I understand that your client, or that there was testimony that the deceased said that's what happened. But did Crane know that they became sealed because of the heat? Where is the evidence that Crane knew that? Well, I don't know that there's, there may not necessarily be direct evidence that Crane knew this. Your argument would be that the manufacturer of this kind of product would inevitably have to know how it had to be treated to be put into operation. Correct. Just like a manufacturer of an automobile would have to know how drivers drive an automobile. Correct. That is absolutely correct. And that is the inference that the jury drew. The jury was entitled to use, to the extent there may not have been direct evidence of that knowledge, the jury was certainly entitled to infer that from the facts, all of which is undisputed. So it sounds like, from my understanding of how this happened, that on these ships anyway, these gaskets got sealed. Was there evidence that these ships were the typical way that these gaskets were used, as opposed to like a very rare way that they were used? And in other instances, they didn't get sealed because they weren't in heat. Do we know how about that in the record? This is the ordinary everyday use of these gaskets and packing. There's packing inside the valve and there's gaskets that attach it. All of these things, when these valves were removed from the system, would be scraped, wire brushed in order to make the flanges clean so that a new gasket could be placed on there. And obviously our argument is that in the scraping and gasking, scraping and wire brushing, that dust was released, that dust was composed of asbestos as the gaskets and packing were at times 80 to 90% asbestos. And for Crane not to know, would have been the equivalent of, Crane knew. And that was the inference that the jury was entitled to draw. What do you have in terms of the, I guess, expert testimony on, I don't even know if it would be expert testimony, but Crane not only had to know that dust was created in the normal use of the product, but also that the quantities of asbestos released in that dust would be hazardous to human health, right? So what do you have on that point as of the 1960s? Well, Dr. Brodkin testified that the amount of asbestos that would have been released from the ordinary scraping and wire brushing would have been 30 million times greater than the background amount. It's an enormous amount of asbestos. Yeah, no, no, I got you. But in the 1960s, right? I take it you don't have any evidence from Crane's representatives directly admitting that they knew at that time that the dust released from the normal use of their products would be hazardous. Do you? No. Okay, so, right. So, but you could still prove that circumstantially by showing basically that the medical community was on notice, here are these published papers, right? So what do you have along those lines? Well, that's all the articles that were set forth in my briefing. In the 1960s? Well, these are in the 30s. No, no, I know. I'm talking about this kind of product. I know all about the product that were at issue in the 30s. I'm talking about this kind of product in the 60s. What do you have on that in terms of the medical literature? Well, there's the, well, before that, well, the most important article is actually the Merriweather Price. That goes back to the 30s. And that specifically refers to gaskets and packing in the naval shipyard context. So that's a, that's, you know, that's, I mean, it's a fiction, or it's a version of facts that Crane offered to the jury that Your Honor is interested in today that is exactly what the jury rejected. So what Crane is asking and what Your Honor is doing is substituting this version of facts that the jury rejected, and that the trial court also rejected. Counsel, I'm just asking you to point me, and with record sites, if helpful, if you can, to the evidence that this jury had before it that it could rationally find in your favor on this point. That's all I'm asking you to do. Well, it's all cited in my briefing with the- Can you give me- I cannot give a record site. You can't give a single record site. That's what I thought. Yeah, well- Because we couldn't find a single record site that backed up the statement you've just made. So, I mean, I don't know, all I'm saying is my job sitting here is to try to figure out, did you put on enough evidence from which a rational jury could find the particular fact that Arizona law requires you to prove? And, I mean, I was expecting you to be able to recite, given that that's one of the lead arguments that your opponent makes on punitive damages, and it seems like you don't have anything specific to point at. I have, well, my briefing is very specific, Your Honor, and I disagree that there is no evidence to support what I'm arguing here today. What I'm saying is, off the top of my head, I can't give you record sites specifically to- Because it's in the brief is what you're saying. Yes, it's in the brief, and if the court has further questions, I'm more than happy to provide a further brief if it would be helpful. But my point is that- I'll reread your brief. I did look at the evidence you cited on my first go-around. I guess I'm still questioning that, but I'll have to take another look. Sure, and I appreciate that, Your Honor, but the point that I think really is important here is that the jury found this, the district court found this twice, found that it was substantial, that substantial evidence supported it to the clear and convincing standard as required by Arizona law, and that Crane is now trying to do what it tried to do below, which is to offer a completely different interpretation of the facts and a completely different version of the evidence that the jury and the district court rejected, and I think under the substantial evidence standard of review, this court has to give great deference to that, and, you know, I was sort of taken aback by Mr. Katyal's initial argument in the sense that he didn't even seem to be addressing what Your Honor is raising, because it's, it's, because it's a, it's, it's, it's- My notes, which may be wrong, but, and we would have to go back to the actual record, says that one of Crane's, actually Crane's medical officer, a Dr. Harvey, was a member of the National Safety Council, which published articles as early as 1935 and 1936 about the dangers of asbestos dust. In one of those articles, the National Safety Council noted, quote, if you can see the dust, you know it to be a terrific hazard. That's at the record at page 68. And another, it wrote that, quote, the exposure of asbestos fibers presented in the weaving and grinding of dry asbestos material offers another type of dust, which may cause fatalities among workers. That's at the record at pages 69 to 70. So I don't know if that's, if I have to write in my notes, but that would seem to be supportive of the- Yes, and that's exactly what is in my brief. And, you know, Your Honor, I apologize that I can't give you exact pages to the record, but that's exactly the character of the evidence that was presented to the jury. And it's presented here as supporting the jury's and the district court's decisions. At this point, there's, you know, the other point that I would make is that the district court could have, on its motion for new trial, either wiped out this punitive damages award or reduced it, but chose not to. And that's because the district court heard this evidence and found that it was evidence of conscious disregard of workers' health and safety. For this court now to reverse that or to reduce this, I don't believe it would be in conformance with the applicable standards. Because we just don't get to do that at all, is that what you're saying? Well, no. Okay, I hear you. How about, why don't you respond to the argument that was presented to us, which is that, given the 100,000 plus lawsuits, many of which I assume the plaintiffs are seeking punitive damages, at most the ratio should be one to one here. What's your response to that? Well, my response to that, number one, is that that is truly not in the record. And it is also a, you know, I can't comment on how many cases have been brought against Crane. I, you know, I don't, you know, I'm sure that they do. Sure. You know that to be true. I do, and I know that there's a reason for that, though. It's a reason because their conduct impacted a lot of people and a lot of families over the last number of decades. And this is a reprehensible thing. Right, so they're saying, though, that in light of the large number of suits in which people are gonna be making exactly that argument, that there just can't be, you know, essentially unlimited punitive damages assessed in each case. Well, this is a multi-billion dollar company, number one. And there's no issues about, you know, that's covered with insurance. And, you know, these are broad public policy questions that I think get far beyond the record of this case. You can come in and make that argument, but it doesn't necessarily, you know, it's, we're looking at this case. We're not looking at all of the 100,000 cases. We're not looking at, you know, especially since that's not even in the record. We don't know that that's, I mean. It doesn't matter if it's 100,000 or 1,000. I know it's more than 1,000. And you know that it's more than 1,000, right? And so the point being that obviously if every jury assess $5 million in punitive damages for basically the same underlying conduct, right? It's true that they sold a lot of product and so there are a lot of people affected, but it's the same conduct that each jury is independently punishing them for, that at some point the argument is that the due process clause puts a limit on that. And what do you have to say to that? Well, I think your Honor's, the way your Honor phrases it is exactly right. They sold a lot of product. There's a lot of profit that's been made here. And I think that, you know, to now at this point say, oh, hey, you know, you can't punish us for our wrongful conduct because we did so much of it and we impacted so many people. In my mind, at this point, it's almost a, it's audacious, number one. And number two, it's just a disregard. It's further evidence of the attitude that resulted perhaps with this jury that refusing to acknowledge that what they did was wrong. And that's what the jury's role was in this case. The jury found that this was wrong, found that it was reprehensible and awarded a $5 million in punitive damages to a family that lost their father prematurely because of something that could have been prevented by simply saying, be careful with this product. It contains asbestos and this could kill you. Dr. Brodkin gave wonderful testimony explaining how important warnings were to workers and how important and how it would change behavior. And that's exactly what Crane did not do. And that's why it should be more than a one-to-one ratio or why this, it should stand exactly the way it is. This is, the jury did nothing wrong here. The district court did nothing wrong. The district court got this right twice in very well-considered and very well-explained orders. So we would, I would submit, unless the court has any other further questions. So you are over your time anyway, but thank you very much for your argument. Thank you, Your Honor. And I think you have a little bit of time left for rebuttal. Let's see. Yes. A little bit under two minutes. Thank you. I thought the most telling thing in my friend's argument was when Judge Friedland asked, what record evidence shows substantial indifference to the value of human life? He was not able to point to anything. I think in my opening, I may have misstated things because I thought you were asking about Judge Friendly's argument about sufficiency evidence. Well, we certainly agree. There was not sufficient evidence when it comes to these products, gaskets. Our opening brief at page 11 quotes Dr. Selikoff, who's the leading asbestos researcher of the era. In 1978, he said, no danger from gaskets and shipyard applications. His only thing he can point to, he points at page 16 of his brief, tells language from Crane saying they had, quote, some knowledge. If you read the full quote, it's some knowledge that asbestos products in general are dangerous. And Judge Rakoff, you asked him about the evidence from the 1930s. That evidence from the 1930s talks about dust being dangerous to be sure, but it's just general dust from asbestos. And if you look at the transcript of pages 1526 and 1518 and 1527, those are all pages in which we explain that we had expert testimony that says asbestos in general doesn't matter. It's this specific kind of asbestos. There's two different kinds of fibers. This is crystalline fibers, not the amosite fibers. These studies that he's talking about are amosite fibers, and amosite is, quote, much more toxic and much more dispersive. This is not amosite, this is crystallite, which is why all these general studies that they point to don't matter. It was only, it took until 1991 for actually a study to take place that said that this stuff is a peer-reviewed study to say that this specific application is dangerous. Why couldn't the jury infer that if there were plenty of studies going back to the 1930s showing that asbestos of X type is bad, leads to terrible results, fatalities, and so forth, asbestos of Y type is bad, and leads to all these problems, that a manufacturer can't simply say, well, we're type Z, so we're not gonna test it, and we'll wait till someone actually tests our specific type, and otherwise, we'll just continue purveying it. Why couldn't a jury reject that and say that was really conscious disregard? For two different reasons. One is about toxicity, the other is about dispersal. There was evidence showing that that other kind was far more toxic than this kind. Those are the record sites I gave to you. And the second point is, there was evidence, including the Navy study in 1968, which is at page 2200 of the transcript, a Navy internal memo saying that this use in gasket material does, quote, does not cause dust in shipyard applications. So when you're talking about asbestos insulation in the walls, that kind of stuff, that stuff spreads and kicks up a lot of dust. That's not true about encapsulated gaskets, and that's why we have said all along. Testimony was that there was dust all over the place when they were grinding these things. So, I mean, it seems like the jury believed that. Well, again, I think Mr. Colburn may have thought so, but our point to you, and it's a failure to warn theory, is if you looked at the literature at the time and asked yourself, is there anything, I mean, this is 50 years ago, this is before I was born, that these injuries took place. I mean, ask yourself, would they have had a duty to warn and label and all of that when the Navy itself didn't think so, when there was no peer-reviewed study that said so. To justify this amount of punitive damages on that record is, I think, a very dangerous thing to do for reasons State Farm says. Okay, thank you very much. I think relying on your youth is not adequate. Thank you. Case to start will be submitted. We'll move to the last case on our calendar, which is Freeman Investment Management Company versus Frank Russell Company.
judges: Watford, Friedland, Rakoff